# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 15, 2012 Session

## STATE OF TENNESSEE v. DOMINIC ERIC FRAUSTO

**Appeal from the Criminal Court for Union County**
**No. 3640   E. Shayne Sexton, Judge**

---

**No. E2011-02574-CCA-R3-CD - Filed December 23, 2013**

---

The Defendant, Dominic Eric Frausto, was convicted by a Union County Criminal Court jury of two counts of aggravated sexual battery, Class B felonies. See T.C.A. § 39-13-504 (2010). The trial court merged the convictions and sentenced him as a Range I, standard offender to twelve years' confinement. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions because the State did not prove the corpus delicti, (2) the trial court erred in failing to comply with Tennessee Criminal Procedure Rule 24 during jury selection, and (3) the trial court erred in sentencing him to the maximum in the range. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Robert L. Jolley, Jr. and Jennifer L. Gower (on appeal), Knoxville, Tennessee; Martha J. Yoakum, District Public Defender; and Dale Potter and Larry Bryant, Assistant District Public Defenders (at trial), Jacksboro, Tennessee, for the appellant, Dominic Eric Frausto.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Lori Phillips-Jones, District Attorney General; and Tracy Tipton Jenkins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant was indicted for two counts of rape of a child and two counts of aggravated sexual battery. At the trial, the victim testified that she was eight years old and that her birthday was September 12, 2000. She identified a photograph of a house and said the Defendant raped her there. The prosecutor showed the victim an anatomically correct

drawing of a female child, and the victim identified the arm, "butt," eye, vagina, and foot on the drawing. The prosecutor also showed the victim an anatomically correct drawing of an adult male, and the victim identified the hand, mouth, nose, and penis on the drawing. She said the Defendant raped her on the couch, and she identified a photograph of the living room. She said he "stuck his penis in [her] vagina." She said she wore clothes before and during the rape but did not remember the type of clothing she wore or whether her clothes were removed. She said that she was wearing panties but that the Defendant moved them aside.

The victim testified that three other people lived in the house but that no one was home when the Defendant moved her panties aside. She said her three-year-old sister was on the love seat watching television. She said it hurt when the Defendant put his penis in her vagina. She said he did not put anything else inside her vagina. She did not remember how old she was when the rape occurred. The victim testified that she, her mother, and her younger sister lived elsewhere.

On cross-examination, the victim testified that she read the term "rape" in the newspaper. She said that she had not seen the drawings of the female child and adult male before the prosecutor showed them to her during the trial. She said she had always used the words "vagina" and "penis" and had never called the body parts anything else. She said she did not remember her age, the day of the week, the date, or whether it was day or night when the rape occurred. She said the rape only happened once and nowhere else. She said that her mother asked if the Defendant touched her and that she said he had because it "really happened," not because her mother wanted her to say he did. She said that the Defendant touched her more than once and that she told her mother it happened more than once.

The victim testified that she was mad at the Defendant because he whipped her and that she did not like it. She said she told her mother she did not want the Defendant around because he whipped her but did not remember how many times he whipped her. She said she did not like her mother dating men.

On redirect examination, the victim testified that the Defendant never told her not to tell her mother or anyone else about the abuse. When asked to describe one of the other times the Defendant touched her, the victim said that she could not describe it because she did not remember but that he stuck his penis in her vagina at his house on the couch. She agreed that she went to the courtroom the night before the trial and that the prosecutor showed her the drawings of the female child and adult male on the projector but only told her to tell the truth.

Lenora Balogh, the victim's mother, testified that she dated the Defendant from approximately February to July 2008. She said she had two children, the victim and a younger daughter. She said that during the time she dated the Defendant, she left the children alone with him several times at her apartment and at the Defendant's house he shared with his mother, aunt, and cousin. She said that when she left the children alone with the Defendant at her apartment, no one else was there and that when she left the children with the Defendant at his house, others were not always there. She said the victim's demeanor toward the Defendant changed in approximately May 2008 when she "went from loving him to hating him." She said that she first learned of the victim's allegations in July, that she reported them immediately to the sheriff's department and the Department of Children's Services (DCS) hotline, and that she contacted the victim's doctor and took her to Children's Hospital.

On cross-examination, Ms. Balogh testified that she met the Defendant in February at the apartment complex where they both lived. She said the Defendant and his family left the apartment complex in March and moved to a house. She said that at the time she and the Defendant were dating, she had lived in the apartments a little over a year and that she saw and spoke to the Defendant's family before she and the Defendant started dating. She said that after the Defendant moved, she went to his new house to see him and began staying there. She said she was attending school two nights per week at "Pellissippi" from 5:00 p.m. to 9:00 or 9:30 p.m. She said that she left her children with the Defendant when she went to school and that his family was sometimes there. She said that she began going to school in the middle of May and that the Defendant watched the children for her once or twice per week from May until June.

Ms. Balogh testified that she stayed at the Defendant's house five or six nights per week and agreed that he only stayed at her apartment one night. She said they were not always together at her apartment because she would leave to buy groceries or fast food. She said that when she left, the children were usually playing or watching a movie with the Defendant and that they watched television in her bedroom. She said that friends or family were at the Defendant's house about half the time and that they watched television in the living room because the Defendant did not have a bed in his bedroom. She said that she and the Defendant slept on a pallet on the floor, that the victim slept on the couch, that her younger daughter slept on the love seat, and that the Defendant's mother, aunt, and cousin slept in their bedrooms.

Ms. Balogh testified that she and the Defendant had sex on the floor in the Defendant's living room and in the storage room at his house and that the victim walked in while Ms. Balogh was performing oral sex on the Defendant in the chair in the living room. She labeled a picture of the living room where she and the Defendant had sex and where she

performed oral sex on the Defendant. She said that when she was performing oral sex on the Defendant, her children were playing in the hall and that no doors separated the hall and the living room. She said that she asked the victim what she wanted and that the victim returned to the hallway to play. She said that she asked the victim later if she saw anything and that the victim told her she did not. She said the children were asleep on the couch when she and the Defendant had sex on the pallet in the floor.

Ms. Balogh testified that a sixteen-year-old girl came to the Defendant's house, that she asked his family questions about the girl, and that "red flags" made her ask the victim if the Defendant had touched her. She stated that she told the DCS investigator, Beth Miracle, the Defendant would not kiss her in front of the sixteen-year-old girl, which was one of the red flags. She said she had no complaints about her relationship with the Defendant until that time.

On redirect examination, Ms. Balogh testified that the red flags appeared when the Defendant told her a truck-driving friend was coming to town and that he was going to meet the friend at the truck stop. She said the Defendant came home with a sixteen-year-old girl, whom he described as his "adopted niece." She said she talked to the Defendant's brother and sister-in-law and then talked to the victim, who told her what happened. She said that after she spoke with the victim, they went to the sheriff's department to report the abuse. She said that the Defendant sent her to buy groceries and fast food during the day and the evening.

Christina Gilpatrick testified that she was the victim's daycare provider for over two years, including the summer before the trial. She said that when the Defendant came with the victim's mother to pick her up, the victim ran back into the house, hid, cried, and said she did not want to go home. On cross-examination, Ms. Gilpatrick said the Defendant came to her house with the victim's mother once at the end of July 2008 and once at the beginning of August 2008.

Union County Sheriff's Department Detective Phillip Johnson testified that he investigated the victim's allegations of child rape and aggravated sexual battery in August 2008. He said that a report was filed with DCS and that DCS notified him. He said that he interviewed and obtained a statement from the Defendant. He said the Defendant waived his Miranda rights. He read the Defendant's statement, which described an encounter with the victim at Ms. Balogh's apartment while she was at the store and her younger daughter was asleep. The Defendant said that he and the victim were in Ms. Balogh's bed watching television, that the victim put her hand on his penis over his shorts, and that he told her that was "not good." He said he asked how she would like it if he put his hand on her. The Defendant stated that the victim grabbed his hand and put it on her vagina and that he rubbed

her vagina on the outside of her shorts while the victim was touching him. He said that this five or ten second incident was the only time such touching occurred and that he did not tell Ms. Balogh when she returned. He said he never touched the victim without clothing, never put his penis in her vagina, and never ejaculated in front of her. The Defendant signed and dated his statement. Detective Johnson said that the Defendant did not make any statement in addition to the written statement. He said he took a buccal swab from the Defendant to be tested for DNA and sent it to the Tennessee Bureau of Investigation (TBI) for analysis.

On cross-examination, Detective Johnson testified that a report was filed with DCS in the first or second week of July 2008 and that he received the report two or three days later. He did not believe the Defendant and Ms. Balogh were still in contact at the time of the report. He stated that he asked the Defendant to come to the police station to talk to him and that the Defendant came on his own and was cooperative. He said the Defendant talked to him at the first interview but told him he needed to talk to his lawyer at the second interview. The interviews occurred before the Defendant was charged.

Detective Johnson testified that the Defendant's cousin came with the Defendant to the first interview. He said that the interview was not recorded and that the department did not have access to recording equipment. He stated that during the first interview, he asked the Defendant if he wanted to write his statement but that the Defendant asked Detective Johnson to write it. Detective Johnson said that he read the Defendant the "noncustodial," that they had a brief conversation, and that he asked the Defendant to sign the Miranda rights waiver at 5:42 p.m. He said that they talked until 6:21 p.m. and that the Defendant was cooperative. He stated that he wrote defendants' statements as they gave them and that the Defendant's statement was not just a summary.

TBI Special Agent Stephanie Dotson testified that she was the team leader who investigated the scene at the Defendant's house. She said she took photographs, drew a diagram, and used presumptive tests to determine which samples of carpet to take to the laboratory. She said the presumptive testing included a high intensity light test and a chemical test.

On cross-examination, Agent Dotson testified that she had training using the high intensity light test and that the light made body fluids glow. She stated that she performed a chemical test on the areas that glowed and that all samples collected tested positive for body fluids. She said they investigated the scene when they were contacted in December. She stated that she did not think the results of the presumptive tests would have been different if she had tested the scene six months earlier but that she was not trained in the degradation of body fluids. She agreed that body fluids could degrade and said that more might have been found if tested earlier. On redirect examination, she stated that she did not

perform the laboratory testing and had no personal knowledge whose DNA was found on the carpet.

TBI Special Agent Forensic Scientist Kimberly Bryant testified that she helped collect the carpet samples at the scene and analyzed the samples at the TBI laboratory. She said that the spermatozoa DNA profile found on a portion of the living-room carpet matched the DNA sample taken from the Defendant. She said the probability of an unrelated individual having the same DNA profile exceeded the world population. She said the DNA profile found on samples of the carpet did not match a DNA sample from Santana Frausto.

On cross-examination, Agent Bryant testified that she did not test a sample of carpet taken in front of the love seat because law enforcement told her two other samples were more probative and that she did not know if sperm was found on that piece of carpet. She stated that the TBI policy allowed her to narrow the evidence she tested to the most probative and that her conversation with law enforcement revealed that the assault happened near the couch, narrowing the areas to be tested. She said that all of the samples tested positive during the presumptive tests at the scene but that she chose to test two of the items at the laboratory because they were most probative. She said she did not limit her testing based on what law enforcement told her. She said law enforcement gave her information that caused her to decide which samples were most probative. She denied that she was only concerned with helping the State obtain a conviction. She said that she was hired to perform her job in an "unbiased manner" and that she proceeded accordingly. She agreed that she worked for the TBI, not for private citizens, and that she would not have tested a piece of carpet if asked by the Defendant's attorney because the evidence she tested came through a submitting agency or a law enforcement agency. On redirect examination, she said that if she were given information in a child rape case that the rape occurred on a specific couch, she would have no reason to test another couch.

Gail Clift, a pediatric nurse practitioner, a forensic pediatric sexual assault nurse examiner, and owner of Pediadvocate Services, testified that she provided medical exams for children who made allegations of physical or sexual abuse. She said that she examined the victim on July 18, 2008, after the victim disclosed that her private parts were touched by an adult. The victim told her she came to see Ms. Clift because the Defendant touched her vagina "on the inside and the outside with his penis and with his finger." She said that during the exam, she discovered the victim had genital warts. She said that the victim did not have any injuries and that the victim's examination was consistent with the history the victim provided. She stated that when a finger or small object was inserted in the vagina of a young child, there were usually no injuries. She said that redness might result but that it would go away quickly, leaving no visible, long-term injury. She said young children did not perceive "inside" the same as adults. She stated that the victim complained of burning and

itching in her vagina and that she instructed the victim to use petroleum jelly and prescribed an ointment.

On cross-examination, Ms. Clift testified that in her private practice, she worked mainly through referrals from DCS and law enforcement. She said she had testified for the defense twice and for the State more than twenty times. She said no injuries were noted on the photographs she took. She agreed that poor hygiene could cause the victim's itching and burning but said the victim was not unclean. She said she prescribed petroleum jelly to cover the genital warts and ointment to treat the redness and irritation. She said the genital warts would not go away with the petroleum jelly but would come and go over a person's lifetime because they were caused by a virus. She said there was no way to know how long the victim had the genital warts. She said she saw three genital warts but no injuries to the victim's hymen.

At the close of the State's proof, the Defendant moved for a judgment of acquittal as to all counts. The trial court granted the motion as to the second count of the indictment for rape of a child.

Lenora Balogh was recalled as a witness for the defense and testified that she reported the incident to DCS on July 8 or 9, 2008. She said she and the victim were not around the Defendant again after she reported the incident to DCS. She said that the Defendant came to her house one day but that she did not go anywhere with him and kept her daughter away from him. On cross-examination, Ms. Balogh testified that Christine Gilpatrick was the victim's daycare provider during the summer of 2008. She said that while she dated the Defendant, he went with her to pick up the victim at daycare and that the victim was not happy to see him.

The Defendant testified that he was from Texas and had lived in Union County, Tennessee, since 2008. He said that he had relatives in Texas, that his thirteen-year-old daughter lived with her mother in Claiborne County, Tennessee, and that his mother, aunt, and cousin lived in Union County. He said that the victim did not like him because he spanked her and because she did not want her mother to date men. He said the victim had "teenage issues." He did not know why the victim did not like men. He said he and Ms. Balogh ended their relationship in early July. When asked about an incident that caused Ms. Balogh to have "red flags," the Defendant said his "adopted niece" brought him cold medicine that day. He said he did not do anything that day because he was "real sick." He stated that he and Ms. Balogh did not have any problems or discussions that day, that she did not want to be affectionate with him, and that she did not say anything to him about the victim.

The Defendant testified that he and Ms. Balogh had sex on the floor, recliner, and sofa in his living room and in "a little pantry room" at his house. He said they had sex almost every night she stayed at his house. He said the children slept on the couch and love seat while he and Ms. Balogh had sex. He said that the younger child would wake but that the victim would stay asleep.

The Defendant testified that he went to the police station on his own and gave a statement to Detective Johnson. He said Detective Johnson asked him how he was doing, offered him a drink, and began asking him questions. He said he gave a statement and was never asked if he wanted to correct it. He recalled the incident that he discussed in his statement about touching the victim and the victim's touching him. He stated that the incident occurred at Ms. Balogh's apartment in June and that it was "just a hands on, hands off." He said that she put her hand on him and that she grabbed his hand and put it on her. He said he was not sexually aroused by the touching but was upset about it. He stated that he told her it was not "too friendly or too nice" and that he asked her where she learned it. He said that she did not answer him and that no other touching occurred.

The Defendant denied having a "venereal" disease, including genital warts. He said he received negative results after being tested for gonorrhea in 1998 or 1999. He denied being asked to submit to testing for any venereal disease or being treated or taking medication for a venereal disease when he was in custody.

The Defendant testified that had never inserted his penis into the victim. He denied the victim had seen him undressed or seen his penis. He said that at the time of the incident, his mother was not working and was home most of the time but that his aunt and cousin worked. He said he was only left alone with the victim once at Ms. Balogh's apartment when Ms. Balogh left for five to ten minutes and went to the store for food. He said a family member was at the house the one or two times he watched the children when Ms. Balogh went to school.

On cross-examination, the Defendant testified that the statement he gave to Detective Johnson was not incorrect. He said the victim put her hand on his penis on top of his clothes, looked at him, smiled, took his hand, and placed it on her. He said there was no rubbing even though his statement said he rubbed her vagina on the outside of her shorts. He said the sixteen-year-old girl who came to his house was not a runaway. He said the girl was from Columbus, Tennessee, and was there on "church business." He said she was a family friend and was not related to him. He said that he kept the victim and her sister at his house and that four people lived at his house at the time. He agreed two of the four people worked a significant amount of time and that his mother had been sick and in the hospital. He said the victim's "teenage issues" included "real issues" with her mother dating men. He agreed that

-8-

it would be reasonable for the victim to hate men if a man had raped her or rubbed her vagina.

On this evidence, the jury acquitted the Defendant of the remaining count of rape of a child and convicted him of two counts of aggravated sexual battery. The trial court merged the two convictions and sentenced him to twelve years' confinement. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his conviction for aggravated sexual battery because the State failed to establish the corpus delicti. The State counters that the evidence is sufficient to support the convictions. We conclude that the State established the corpus delicti and that the Defendant is not entitled to relief.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).

Corpus delicti means "the body of the crime." State v. Shepherd, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992). The two elements necessary to prove the corpus delicti are "(1) that a certain result has been produced, for example, a man has died or a building has been burned, and (2) some person is criminally responsible for the act." Wooten v. State, 314 S.W.2d 1, 5 (1958). Our supreme court has held that:

> [W]hile the corpus delicti cannot be established by confessions alone, yet the confessions may be taken in connection with other evidence, direct or circumstantial, corroborating them, and, if from all of the evidence so considered together the corpus delicti and the guilt of the person with reference thereto is established beyond a reasonable doubt, it is the duty of the jury to convict.

Ashby v. State, 139 S.W. 872, 875 (Tenn. 1911).

Only slight proof is required to establish the corpus delicti. State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000). The corroborating evidence can be proof that bolsters the confession itself, thereby proving the offense through the defendant's statements. State v. Housler, 193 S.W.3d 476 (Tenn. 2006) (citing Smith v. United States, 348 S.W.3d 147 (1954)); see also State v. Alec Joseph Mesot, M2006-0259-CCA-R3-CD (Tenn. Crim. App. Mar. 14, 2008) (Woodall, J., concurring and dissenting) (stating that the corroborating evidence does not have to independently establish the corpus delicti and that the critical inquiry is "whether the corroboration sufficiently establishes the *trustworthiness* of the confession").

The Defendant was charged with four offenses:

Count 1: Rape of a child at the Defendant's house

Count 2: Rape of a child at the Defendant's house

Count 3: Aggravated sexual battery at the victim's mother's apartment

Count 4: Aggravated sexual battery at the victim's mother's apartment

The trial court granted the Defendant's motion for judgment of acquittal and dismissed Count 2. The jury found the Defendant not guilty of Count 1. The Defendant's single merged conviction is based upon the jury's findings of guilt in Counts 3 and 4.

For aggravated sexual battery, the State was required to prove that the Defendant engaged in unlawful sexual contact with a victim less than thirteen years old. T.C.A. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, if that touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6).

The Defendant said in his pretrial statement that the victim put her hand on his penis over his shorts while in Ms. Balogh's bedroom watching television. He admitted that the victim "grabbed [his] hand and put it on her vagina" and that he rubbed her vagina on the outside of her shorts while the victim touched him. He said in his pretrial statement that the only time the "sexual touching" occurred was at Ms. Balogh's apartment. Detective Johnson wrote the statement, and the Defendant initialed and signed it.

In his trial testimony, the Defendant acknowledged that the statement was his and that it was not incorrect in any way. On cross-examination, however, he denied that he rubbed the victim's vagina. He said, "I forgot about the rubbing. I didn't know that was in there." The Defendant testified that the victim touched his penis over his clothes and put his hand

-10-

on her vagina. He denied that the contact was sexually exciting to him. The victim testified equivocally about whether more than one incident of sexual penetration occurred. When asked if there was more than one "touching," the victim said there was, but she later clarified that she meant penile/vaginal contact.

The Defendant's affirmation in his trial testimony that the pretrial statement was his, that it was correct, and that he signed it provided corroborating evidence that established the trustworthiness of the statement. Although the Defendant later testified that he did not rub the victim, the jury was permitted to credit the portions of his testimony that it considered consistent with the truth and discredit the portions they believed were untrue. See, e.g., State v. Gilbert, 612 S.W.2d 188, 190 (Tenn. Crim. App. 1980). We note, as well, that our review is conducted by viewing the evidence in the light most favorable to the State. See Sheffield, 676 S.W.2d at 547; Cabbage, 571 S.W.2d at 835. In addition to the Defendant's testimony corroborating the confession, the evidence showed that the Defendant stayed with the victim and the victim's sister at the victim's mother's apartment when the victim's mother was away. The Defendant's confession established that the crime occurred, and the confession was adequately corroborated by the Defendant's testimony and proof the Defendant had been at the location of the crime with the victim when the victim's mother was not present. We conclude that the evidence is sufficient to support the conviction. The Defendant is not entitled to relief on this basis.

## II

The Defendant contends that the trial court erred by failing to adhere to the mandatory jury selection procedures in Tennessee Criminal Procedure Rule 24. He argues that he was prejudiced by the denial of his right to exercise any meaningful peremptory challenge and that the judicial process was harmed by the court's failure to adhere to the rule. The State contends that although the court departed from the Rule 24(d) procedure, it was harmless because the Defendant fully exercised his peremptory challenge rights and that no partisan or incompetent juror was seated as a result of the court's technical departure from the Rule 24(d) procedure.

Rule 24(d), in relevant part, states:

(d) Exercising Peremptory Challenge. After the court conducts its initial examination and seats a tentative group of jurors not excluded for cause, the following procedure shall be followed until a full jury has been selected from those jurors and accepted by counsel:

(1) At each round of peremptory challenges, counsel shall submit simultaneously to the court either a blank sheet of paper or a sheet of paper challenging one or more jurors in the group of the first twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) jurors who have been seated. Neither party shall make known the fact that the party has not challenged a juror.

(2) Replacement jurors will be seated in the panel of twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) in the order of their selection.

(3) If necessary, additional replacement jurors will be examined for cause and, after passed, counsel will again submit simultaneously, and in writing, the name of any juror in the group of twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) that counsel elects to challenge peremptorily. Peremptory challenges may be directed to any member of the jury; counsel are not limited to using such challenges against replacement jurors. . . .

Tenn. R. Crim. P. 24(d). "[W]hile the 'adherence to the procedure prescribed by Tenn. R. Crim. P. 24(c) is mandatory,' deviation from the Rule may qualify as harmless error." State v. Lester Allen Clayton, No. 03C01-9901-CR-00049, slip op. at 3 (Tenn. Crim. App. Jan. 26, 2000) (quoting State v. Phyliss Ann McBride, No. 01C01-9606-CC-00269, slip op. at 7 (Tenn. Crim. App. Oct. 24, 1997) (citations omitted)), perm. app. denied (Tenn. Oct. 23, 2000). The burden is on the Defendant to prove prejudice or purposeful discrimination in the selection of a jury. State v. Coleman, 865 S.W.2d 455, 458 (Tenn. 1993). Proof of actual prejudice is not required when deviations from the statute are "flagrant, unreasonable, and unnecessary." State v. Bondurant, 4 S.W.3d 662, 668 (Tenn. 1999); see also State v. Lynn, 924 S.W.2d 892, 898 (Tenn. 1996) (both cases involve deviations in the procedure when there was an unexpected need for another pool from which to select jurors).

A trial court is granted wide discretion in the procedure used in selecting a fair and impartial jury, subject to the Rules of Criminal Procedure, and it will not be overturned absent an abuse of discretion. State v. Bowers, 77 S.W.3d 776, 783 (Tenn. Crim. App. 2001) (citing State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989)). "The ultimate goal of voir dire is to [e]nsure that jurors are competent, unbiased, and impartial . . . ." State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994) (citing State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993)). Our supreme court has explained that the "[r]ules prescribing jury selection procedures are intended to protect the integrity of the jury system by providing a uniform and

ordered method that ensures the accused a fair and impartial jury chosen from a fair cross-section of the community." Coleman, 865 S.W.2d at 458.

We note that the Defendant objected to the irregularity before the jury was sworn. See T.C.A. § 22-2-313 (requiring an objection to an irregularity in jury selection before the jury is sworn). The jury selection process began with the trial court's selection of eighteen prospective jurors. The trial court reminded the parties that they had nine peremptory challenges and that thirteen jurors would be seated for the trial. All eighteen prospective jurors were questioned by both sides, and the parties were allowed to use their peremptory challenges with respect to all eighteen. Seven prospective jurors were excused. The remaining eleven were taken to the jury room, and eighteen new prospective jurors were seated.

The new eighteen prospective jurors were questioned by both sides. The parties were allowed to use their remaining peremptory challenges with respect to all eighteen seated in the second round or to "back strike" any of the eleven prospective jurors in the jury room. Five prospective jurors were excused from the second round. In the first round, the Defendant used seven challenges. In the second round, the Defendant used his remaining two challenges, and the State used three. After both rounds, twenty-three prospective jurors remained, and the court randomly selected ten jurors to be excused, leaving thirteen jurors to be seated. The trial court stated, "[T]his [method] has been used by this Court for years, for years, and it's been accepted throughout the State."

The trial court erred in deviating from the prescribed procedure by not seating replacement jurors in the order of their selection and preventing the parties from knowing which of the remaining twenty-three jurors would be selected to serve. The Defendant has not shown, however, that he was prejudiced by the court's deviation from the statutory procedure or that the deviation was so egregious that prejudice must be presumed. We conclude that the error in the Defendant's case was harmless. We caution the trial court, however, that its jury selection method should comply with the relevant rules.

### III

The Defendant contends that the trial court abused its discretion in sentencing him to the maximum term of twelve years. He argues that the court erroneously applied enhancement factors not supported by the evidence. The State counters that the court properly sentenced the Defendant.

The Tennessee Supreme Court adopted the present standard of review for sentencing in State v. Bise, 380 S.W.3d 682 (Tenn. 2012). The length of a sentence "within the

-13-

appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" Id. at 708. In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991); State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

"[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id.

The Defendant argues that the trial court erred in finding that enhancement factor (1) applied. See T.C.A. § 40-35-114(1) (2010) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range."). The court found that the Defendant's previous history of criminal convictions had been "clearly" shown. The presentence report showed no prior convictions but noted that the Defendant had a poor driving history involving commercial vehicles. The Defendant's traffic convictions could not be verified because they included out-of-state dispositions, but he reported that he no longer had a valid commercial driver's license. During the Defendant's presentence report interview, he admitted that he used methamphetamine and marijuana and drank alcohol when he was underage. During his presentence psychosexual evaluation, he admitted that he had five misdemeanor convictions and had been sentenced to jail twice. Although this court has previously concluded that a trial judge may find evidence of criminal behavior even though there has been no conviction, the record does not include verification of the Defendant's "poor driving history" or prior criminal behavior. See State v. Massey, 757 S.W.2d 350, 352 (Tenn. Crim. App. 1988). However, the Defendant admitted several prior misdemeanor convictions and serving time in confinement. We conclude that the record supports the trial court's applying enhancement factor (1).

The Defendant argues that the trial court erred in finding that enhancement factor (6) applied. See T.C.A. § 40-35-114(6) ("The personal injuries inflicted upon . . . the victim [were] particularly great."). The court considered the victim's counselor's testimony on the extent of the mental injuries the victim suffered and would suffer and found "trouble coming

-14-

her way." In State v. Jones, 883 S.W.2d 597 (Tenn. 1994), our supreme court noted that a "particularly great injury" is one that involves "'substantial risk of death,' 'protracted unconsciousness,' 'extreme physical pain,' 'protracted or obvious disfigurement,' and 'protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty.'" Jones, 883 S.W.2d at 602 (quoting T.C.A. § 39-11-106(a)(33)), superseded on other grounds by statute, T.C.A. § 40-35-210(c) (2010), as recognized in State v. Carico, 968 S.W.2d 280, 288-89 (Tenn. 1998). Janet McCracken, the victim's counselor, testified at the sentencing hearing that the victim attended counseling sessions after the offense and that the victim would likely have future repercussions from the incident. No evidence exists, however, showing that her injuries arose to the level of "particularly great" as defined by our supreme court. We agree with the Defendant that enhancement factor (6) was improperly applied to enhance his sentence.

Although not argued at the sentencing hearing, the State argues in its brief that enhancement factor (14) applied relative to abuse of a "position of . . . private trust . . . that significantly facilitated the commission or the fulfillment of the offense." See T.C.A. § 40-35-114(14). The trial court did not apply enhancement factor (14), but the record supports its application. Our supreme court has stated that the "position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples" of someone in a position of trust. State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999) (quoting State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996)). In Kissinger, the supreme court distinguished between the application of this enhancement factor to a defendant who was merely a casual visitor to the victim's home and to a defendant who had been entrusted with the care of a victim. The court found a position of trust existed in the latter circumstance but not in the former.

In this case, the Defendant was entrusted as the victim's caretaker when she stayed at his house while her mother was at school and when she stayed at her mother's apartment while her mother went for food and groceries. She spent multiple nights at the Defendant's house, and he stayed at her mother's apartment. The Defendant was aware the victim would be alone with him at both his house and her mother's apartment, and he accepted responsibility for her well-being during that time by consenting to the stay. The enhancement factor based on abusing a position of trust applies.

Regarding the Defendant's argument that his twelve-year sentence is excessive, a presumption of reasonableness is afforded to a sentence "within the appropriate statutory range." Bise, 380 S.W.3d at 707. As a Range I, standard offender convicted of a Class B felony, the Defendant faced a sentence of eight to twelve years. See T.C.A. §§ 40-35-105; 40-35-112(a)(2) (2010). No mitigating factors were offered, and we have concluded that one of the enhancement factors was erroneously applied. The trial court, though, considered the principles of sentencing and found one applicable enhancement factor. The record also

-15-

supports one enhancement factor not considered by the court. Given the circumstances of the Defendant's offense, his relationship with the victim, and his admitted criminal history, the record supports the Defendant's sentence. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE